## THE CITY OF WESTPORT, Appellant, v. MULHOLLAND.

### In Banc, December 18, 1900.

1. Digging up Street: MAINTAINING RAILWAY: ARREST AND FINE: CONSTITUTION. A city ordinance provided: "No person shall tear up, dig up or ditch or otherwise interefere with any of the streets or alleys within the limits of the city without permission first obtained from the board of aldermen." The county court, then the proper authority, before the extension of the city limits over the street in question, or the passage of the ordinance, had granted to a street railway company the right to lay and maintain its railway, and the defendant, an employee of the said company, without permission of the board of aldermen, dug and tore up the street in reconstructing a switch that was necessary for the operation of the road. *Held,* that the ordinance in question is not such an impairment of a contract as the Constitution prohibits, but only a reasonable exercise of municipal authority over the railway company as a grantee of a franchise affecting the safety and well-being of the public, *and* the fine imposed by the city on defendant for a violation of said ordinance is upheld.

2. ——: ——: POLICE REGULATION. Such ordinance is a police regulation to protect the streets of the city.

3. ——: SAFETY OF STREETS. The city is charged with the duty of maintaining its streets in a reasonably safe condition for public use, and this duty it can not divest itself of, and in aid of the rightful performance of duty, although it can not arbitrarily refuse the citizen the right to dig up the street to connect, or repair a broken connection, with a water main, gas main, sewer, or, in case of a corporation, for the purpose of putting in or repairing a railway switch when necessary to its business, yet it can compel the citizen or corporation to observe the reasonable regulation to obtain permission from the proper city authorities before such right is exercised, and also that the work be done as the ordinances require.

Transferred from Kansas City Court of Appeals.

REVERSED AND REMANDED.

*R. B. Middlebrook* and *A. S. Marley* for appellant.

(1) When one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use, he must submit to the control. Railroad v. Iowa, 94 U. S. 155; Peck v. Railroad, 94 U. S. 164; Railroad Commission Cases, 116 U. S. 307; Munn v. Illinois, 94 U. S. 113; State to use v. Railroad, 83 Mo. 149. (2) The ordinance is a proper exercise of the police power of the city. Railroad v. Chicago, 140 Ill. 317. In New York, it has been held that a statute authorizing the construction of highways across railroad tracks, without compensation, does not violate the constitutional provision against taking private property for public use, or impair the obligation of contracts.

Railroad v. Brownell, 24 N. Y. 345; Railroad v. Boston, 5 Lansing 561; Railroad v. Sharpe, 38 Ohio St. 150; Railroad v. Railroad, 20 Id. 604; Thorpe v. Railroad, 27 Vt. 140; Railroad v. Milwaukee, 97 Wis. 422; Beer Co. v. Massachusetts, 97 U. S. 25; Lancaster Co. v. Railroad, 29 Neb. 417; Railroad v. Co. Commrs., 79 Me. 386; People ex rel. v. Railroad, 70 N. Y. 569; Minnesota ex rel. v. Dist. Ct., 42 Minn. 247; Kansas v. Railroad, 33 Kan. 176; Railroad v. Smith, 91 Ind. 119; Railroad v. Nebraska, 170 U. S. 74; Beer Co. v. Massachusetts, 97 U. S. 25; Fertilizing Co. v. Hyde Park, 97 U. S. 659; Gas Co. v. Light Co., 115 U. S. 650; Mugler v. Kansas, 123 U. S. 623; Railroad v. Defiance, 167 U. S. 88; State to use v. Railroad, 83 Mo. 144; Railroad v. State, 37 Ind. 489; Railroad v. Claire, 6 Ind. App. 390; 33 N. E. 918; Railroad v. Crist, 116 Ind. 446; 19 N. E. 310. (3) Grants of rights and privileges in streets are construed strictly against grantees, and liberally in favor of the public. State ex rel. v. Payne, 129 Mo. 468; Ransom v. Railroad, 104 Mo. 375; St. Louis v. Railroad, 13 Mo. App. 524; 87 Mo. 151.

*Karnes, Holmes & Krauthoff* for respondent.

(1) When the city of Westport so extended its corporate boundaries as to include within the same a part of the county road known as Rosedale avenue, over which the Grand Avenue Railway Company had previously acquired from the county court the right to construct, maintain and operate its railroad, the rights of the railway company over the public highway remained the same after the extension of the city's limits as before. Under the constitution and laws of the land, the municipality was powerless to abridge, interfere with or in any way affect those rights. Detroit v. Railroad,

12 Mich. 333; Quinn v. City of Paterson, 27 N. J. L. 35; People v. Detroit, etc., Co., 37 Mich. 195; St. Catherines v. Gardner, 20 U. C. C. P. 107. "Obviously, upon the clearest consideration of law and justice, the grant of authority to the company, when accepted and acted upon, became an irrevocable contract, and the city is powerless to set it aside or to interpolate new and more onerous conditions therein." Dartmouth College Case, 4 Wheat. 518; St. Louis v. Western Union Tel. Co., 148 U. S. 92; Baltimore Trust Co. v. Baltimore, 64 Fed. Rep. 153; Wire Co. v. Baltimore, 66 Fed. Rep. 140; Rhodes v. Mummery, 48 Ind. 216; Railroad v. Railroad, 11 Ch. D. 625; Hickman v. Kansas City, 120 Mo. 110. (2) The only justification suggested by counsel for appellant is that the city has the right to require such permission from the board of aldermen as an exercise of its police power. But it is clear enough that the contention can not be sustained on any such ground. "As applied to the control of street railways, the police power is the continuing and paramount authority of the legislature, within its constitutional prerogatives, and of municipal corporations, under their delegated powers, to establish regulations which promote the public welfare and do not unreasonably interfere with the franchise, management or business of the company or violate the obligations of any valid contract." Booth on Street Railway Law, sec. 220, p. 302; Sloan v. Railroad, 61 Mo. 24.

*Daniel B. Holmes, Frank Hagerman* and *Willard P. Hall* also for respondent.

(1) The thing prohibited is the tearing up or otherwise interfering with the streets of said city without the consent of the board of aldermen. The meaning is plain and clear:

Without the consent, the act prohibited must not be done, but with the consent it may be done. It is the consent, therefore, that controls. If it exists the act is lawful. The street railway company had the consent of Westport for doing the act complained of; defendant was in the employment of the railway company, was doing the act for it, and therefore the act was lawful and not in violation of the ordinance. The railway company had the consent of Westport because its franchise authorized the act; its franchise had the same force and effect as if granted by Westport, and, therefore, the act was authorized by Westport. And, of course, an act authorized by Westport was consented to by its board of aldermen. (2) If the ordinance be construed to prohibit an interference with the streets previously authorized by Westport in said franchise, then to that extent it is unconstitutional. We again refer to the facts conceded by opposing counsel and by Division One in its opinion, that the act complained of was authorized by its franchise, and that said franchise was as effectual as if granted by Westport itself. The act complained of, therefore, was authorized by Westport. Now, then, if the franchise be considered as if granted by Westport, if the act be treated as authorized by Westport, Westport afterwards could not prohibit the act legally. Having granted the franchise, Westport lost the power of prohibition and retained only that of regulation. We concede now, and always have conceded, that she retained the power of regulation. But the trouble is that the ordinance is not one of regulation; it is one of absolute prohibition. Confined to the acts within its terms, acts to which Westport has not consented, the ordinance is all right and its prohibition legal. But extend the prohibition to acts to which Westport has given its legal and valid consent, and then another question arises, i. e., the legal power of Westport

to violate its contract giving the consent.    We may put it in still another way:    As to all acts authorized by the franchise, Westport possessed only the power of regulation; now the power of regulation does not include the power to prohibit. Municipal Police Ordinances (Horn and Bemis), sec. 30; McCormick v. Mayor, 39 N. J. L. 38; Brown v. Oberlin, 41 Ohio St. 476.    For a city council to require a permit from themselves for the doing of a certain thing is to prohibit said thing.    Austin v. Murray, 16 Pick. 121.    This is also true of a license.    Duckwall v. New Albany, 25 Ind. 283.    The ordinance prohibits and does not regulate, and therefore is void if it violates the franchise.

## In Division One.

VALLIANT, J.—Defendant was convicted and fined in the police court of the city of Westport upon a charge of violation of a city ordinance of which the first section is: "No person or persons shall tear up, dig up or ditch or otherwise interfere with any of the streets or alleys within the limits of the city of Westport without the permission first obtained from the board of aldermen of said city."

The second section prescribed the penalty for the violation.

Upon appeal to the criminal court of Jackson county, the cause was tried on an agreed statement of facts, upon which there was a judgment of acquittal, and the city appealed to the Kansas City Court of Appeals.    The cause was transferred to this court because it involves a construction of the Constitution.

The facts are that in 1887 the county court of Jackson county granted the Grand Avenue Railway Company the right to construct and maintain its street railway on Rose-

dale avenue, then a county road under the jurisdiction of the county court, and under that grant the company constructed and has since maintained and operated its railway; in April, 1891, the city of Westport extended its limits and took in Rosedale avenue, and with it the railroad; afterwards, in November, 1891, the defendant, in the service of the railway company, without permission of the board of aldermen, dug up and tore up the street in reconstructing a switch that was necessary for the operation of the railroad, and that is the offense for which he was tried. The city ordinance was passed several years before the city extended its limits and was in force at the time of the alleged violation by defendant. The whole defense in the case is that the county court, when it had the authority to do so in 1887, having granted the railroad company the right to lay and maintain its railroad on the public road, which grant included the right to do what the defendant in this instance did, the railroad company could not, under that provision of the Constitution which forbids laws impairing the obligation of contracts, be deprived of that right or limited in its exercise. That is the only proposition in the case.

That the city could not by its ordinance deprive the railroad company of its franchise or impair the obligation of its contract with the county court, treating the grant of the franchise and its acceptance as a contract, is a proposition of law that has not been gainsaid in this country since the decision in the Dartmouth College case in 1819. But that in the exercise of a franchise affecting the safety or wellbeing of the public the grantee is under the control of the police powers of the State is a proposition equally well settled. The question then is, is the authority of the municipality asserted under that ordinance the impairment of the contract or only a reasonable regulation of its exercise? In construing the ordi-

nance for the purpose of testing its validity under the Constitution we must accord to it a reasonable and lawful purpose, if it is susceptible of such, and must assume that in its exercise a wise discretion will be used by the city officials, either of their own will or under compulsion of the courts.

It is undoubtedly true that in maintaining and operating its railroad, repairs will be required which will necessitate the digging and tearing up of the street more or less, and the right to do this under reasonable police regulations is implied in the grant of the franchise, and if this ordinance is construed to mean that it is left with the city officers to say, arbitrarily, whether or not the railroad company may tear up the streets to make repairs, it would be equivalent to subjecting the existence of the franchise to the will of the board of aldermen and would be in violation of the Constitution.

But if it means that when repairs of the railroad become necessary, requiring the tearing up of the street, · and rendering it for the time being unsafe or inconvenient for travel, the railroad people must, before doing so, report to the city authorities and proceed in the matter under such reasonable police restrictions as they may prescribe, then it impairs no contract, and violates no provision of the Constitution, and we may add, that if that is what it means, the courts will hold the city to it, if it should attempt to use it to impair the railroad company's rights.

It will not do for the railroad company to say that it has now the same rights that it had before it was taken into the city, for that is so only under conditions. The rights are the same but they are to be adjusted to the changed situation, just as by the same rule are the rights of the people whose homes are embraced in the new city limits. Their vested titles are not violated, but in the manner in which they may use their property the city has something to say.

As was said by our Kansas City Court of Appeals in this case per ELLISON, J.: "Grant that before the extension the company had as much right to dig into and tear up the street as a citizen has to build a frame house anywhere on his land which is outside of a city, yet, in the like case, if the citizen's land becomes a part of a city by the extension of the limits, his right may become extinguished by the extension of the fire limits."

In a wise exercise of the police power of the State is shown one of the highest traits of good government. The Supreme Court of Wisconsin has said: "The charter of a corporation in no sense exempts it from police supervision and regulation. Such an exemption could never be implied from mere grant of power and would not be valid if expressly conferred. It is frequently and rightly said that sovereign authority can not divest itself of its ordinary police power over persons, whether natural or artificial, any more than it can of the power to make laws or to punish crime." [Railroad v. Milwaukee, 97 Wis. loc. cit. 422.] And again in the same case it is said: "The tendency of modern development is in the direction of greater, rather than more restricted police power, and necessarily so in order to meet the new dangers and increase of old dangers constantly occurring as natural incidents of advancing civilization."

As early as 1855 the Supreme Court of Vermont speaking through REDFIELD, C. J., said: "But it has sometimes been supposed that corporations possess a kind of immunity and exemption from legislative control, extending to everything materially affecting their interest, and where there is no express reservation in their charters." Then after learned discussion of that subject the court further said: "We think the power of the legislature to control existing railways in

this respect, may be found in the general control over the police of the country, which resides in the law-making power of all free states . . . . . . .   That is a responsibility which legislatures can not divest themselves of, if they would." [Thorpe v. Railroad, 27 Vt. 140.]   And in 1837 the Supreme Court of the United States per TANEY, C. J., said: "The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the power necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to privileged corporations." [Charles River Bridge v. Warren Bridge, 11 Peters loc. cit. 548.]   The Supreme Court of Nebraska has expressed the law thus: "Under the general police power of the State, the legislature has the authority to place new and additional burdens upon corporations, when such burdens are for the safety of the people and for the public good, although the power to do so may not be reserved in the charter. . . . . .   Of course, under the guise of the police power, property of corporations or individuals can not be confiscated." [Lancaster Co. v. Railroad, 29 Neb. loc. cit. 417.]

In Beer Co. v. Massachusetts, 97 U. S. loc. cit. 33, per BRADLEY, J., the court said:   "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and public morals.   The legislature can not, by any contract, divest itself of the power to provide for these objects."   In Fertilizing Co. v. Hyde Park, 97 U. S. 659, the plaintiff was a corporation chartered by the Legislature of Illinois, authorized to locate its works in Cook county at a certain point,

and manufacture fertilizer from the carcasses of dead ani-
mals.    The location was an uninhabited spot when the cor-
poration established its works and engaged on its peculiar
industry.    Afterwards the village of Hyde Park grew up
and extended its limits to include the fertilizer works.    Then
the village passed an ordinance forbidding the hauling of
offensive matter through the village, which very materially
interferred with the exercise of the corporation's franchise.
The question before the court was as to the validity of the
ordinance.    The court said, loc. cit. 667:    "We can not
doubt that the police power of the State was applicable and
adequate to give an effectual remedy.    That power belonged
to the States when the Federal Constitution was adopted.
They did not surrender it, and they all have it now.    It
extends to the entire property and business within their local
jurisdiction."

The same principle has been declared by this court.
[State ex rel. v. Murphy, 130 Mo. 10.] In that case the Laclede
Gas Light Company claimed the right under its charter to exca-
vate the streets of the city to lay electric wires underground, but
the city interposed and forbade its doing so, until it should
comply with certain ordinances passed to regulate such mat-
ters.    This court, per MACFARLANE, J., said, loc. cit. 23:
"The grant by the State to relator, though construed to in-
clude the right to use electricity for illuminating purposes
in respect to such right, was taken subject to reasonable
regulations as to its use, and the power to regulate has been
delegated to the city of St. Louis.    Under its general police
power, the city has the right to require compliance with
reasonable regulations as a condition to using its streets by
electric wires."

The briefs of counsel are rich with learning on this
subject, but we have quoted sufficient to show the state of the

law and to guide us to a conclusion in this case. The ordinance in question is clearly a police regulation to protect the streets of the city. It was enacted before the city extended its limits, but when the limits were extended the ordinance covered all the territory taken in, and the inhabitants thereof, both natural and artificial. [Hickman v. Kansas City, 120 Mo. loc. cit. 126.] The city is charged with the duty of preserving its streets in a reasonably safe condition for the public use; the lives of its inhabitants and the safety of their property demands the performance of that duty, and the city could not divest itself of it if it desired to do so. If we say that the railroad company has a right to tear up the streets without regard to the city's authority, then we have a power turned loose in the streets inconsistent with the particular sovereign power delegated by the State to the city, and liable to be destructive of the public safety. A private citizen sometimes has the right to dig up the street, for example, if it be necessary to connect or repair a broken connection with a water main, a gas main, a sewer, and that right the city authorities can not arbitrarily refuse, but the citizen must comply with the reasonable regulations and obtain permission and do the work as the ordinance requires. The corporation has as much right as the citizen, but no greater; that is, it has the right to dig up the street when necessary for its business, but like the citizen it must apply to the constituted authorities for leave, and act under reasonable regulations. It is argued by the learned counsel for the railroad corporation, that the power to grant permission implies the power to refuse it and thus puts the franchise at the mercy of the city authorities. But there is a law over the city authorities, as well as over the railroad corporation, and the ordinance is to be construed, as designed to effectuate a lawful and not an unlawful purpose. It means that the railroad

Vol 159 mo—7

company can not dig up the streets without permission of the board of aldermen, but it also means that the board of aldermen can not refuse permission under reasonable regulations when the railroad company needs it.

Under the agreed statement of facts the defendant should have been held guilty of violation of the ordinance. The judgment is reversed and the cause remanded to the circuit court of Jackson county, to be proceeded with according to the law as herein laid down. All concur.

PER CURIAM.—The foregoing opinion delivered by Valliant, J., in Division No. 1, is adopted as the opinion of the Court in Banc, all the judges concurring.